**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ZEMIRA SAKANOVIC,**

          **Plaintiff,**

  **vs.**

                  **6:22-CV-00359**
                  **(MAD/ATB)**

**UTICA NATIONAL,**

          **Defendant.**
_____

**APPEARANCES:**        **OF COUNSEL:**

**ZEMIRA SAKANOVIC**
107 Dickinson Street
Utica, New York 13501
Plaintiff, _Pro Se_

**BOND SHOENECK & KING, PLLC**    **ADAM P. MASTROLEO, ESQ.**
One Lincoln Center
Syracuse, New York 13202
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

    On April 18, 2022, _pro se_ Plaintiff Zemira Sakanovic ("Plaintiff") commenced this action

against Defendant Utica National ("Defendant"),[1] alleging employment discrimination in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with

Disabilities Act ("ADA"), and the Age Discrimination in Employment Act ("ADEA").  _See_ Dkt.

No. 1 at 2; Dkt. No. 1-1.  On January 23, 2023, Defendant filed a motion for judgment on the

---

[1] Defendant informed the Court that Defendant was "improperly identified" as Utica National, and
that its proper name is Utica Mutual Insurance Company.  _See_ Dkt. No. 22 at 1.

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that most of Plaintiff's claims are time barred and that the remaining claims should be dismissed for failing to state a claim. *See* Dkt. No. 27-1 at 6-7.

For the reasons set forth below, Defendant's judgment on the pleadings is granted.

## II. BACKGROUND

According to the complaint, Plaintiff is a female Bosnian Muslim with three children, *see* Dkt. No. 1-1 at 7-8, and is over forty years old. *See* Dkt. No. 30 at 18; Dkt. No. 1-2 at 16. Defendant is a commercial and personal insurance company that employs "approximately 1,300 associates across nine regional office locations" with a corporate headquarters located in New Hartford, New York. Dkt. No. 1-2 at 110. Defendant's "insurance products are sold through agent-customers and range from commercial insurance (i.e., workers Compensation, Errors & Omissions) to Personal Insurance (i.e., Homeowners Auto)." *Id.*

Plaintiff worked for Defendant for approximately five years until her termination on May 2, 2021. *See* Dkt. No. 1-1 at 1. Plaintiff initially started in 2015 as a temporary worker before becoming a permanent and full-time audit examiner in January 2016. *See id.* In February 2017, following her request, Plaintiff received approval to change to part-time status. *See* Dkt. No. 1-2 at 220; Dkt. No. 1-1 at 8. Defendant informed Plaintiff that becoming a part-time employee would not affect her ability to advance. *See* Dkt. No. 1-1 at 7-8. Plaintiff returned to full-time status on December 31, 2018. *See* Dkt. No. 1-2 at 220.

At all times relevant, Linda Mishalanie ("Ms. Mishalanie") served as Plaintiff's supervisor. *See* Dkt. No. 1-1 at 1. "From the start, [Plaintiff] noticed that Ms. Mishalanie [] act[ed] differently toward [Plaintiff] than she did toward other employees." *Id.* For instance, Ms. Mishalanie "did not want to authorize a training, [] which every new employee was [en]titled to

based on company promises[.]" *Id.* Ms. Mishalanie would schedule Plaintiff for other trainings necessary for pay raises, but then not allow Plaintiff to complete the training. *See id.* According to Plaintiff, every other employee was offered proper training and pay raises. *See id.* at 8-9. Plaintiff also received scheduled raises, though she claims they were not enough based on her level and quality of work. *See id.* at 9. Plaintiff discussed this issue with human resources.

Additionally, "year after year" Ms. Mishalanie would intentionally place Halloween decorations around Plaintiff's cubicle, even though Plaintiff told her that it was against her religion. *Id.* at 7. Ms. Mishalanie knew specifically that Plaintiff was Muslim because, after Plaintiff's mother passed away in September 2019, Defendant provided a donation to the West Bosnian Islamic Center. *See id.* Plaintiff informed Ms. Mishalanie that her family went there for their "religion needs." *Id.* In October 2019, Plaintiff took down the Halloween decorations herself, confronted Ms. Mishalanie, and told her to stop. *See id.*

At some point early in Plaintiff's employment, after a younger—albeit more senior—male received a promotion that Plaintiff had applied for, Ms. Mishalanie told her that, to receive a promotion to a senior title, Plaintiff would need to earn a "Workers Compensation certificate." *Id.* at 5. Plaintiff earned the certificate in 2018. *See id.* However, in February or March of 2019, Ms. Mishalanie promoted a younger "Irish" or non-immigrant male who had less seniority than Plaintiff. *See id.* at 5-6. The younger male did not have a certificate. *See id.*

Regarding the 2019 lost promotion, Plaintiff "decide[d] to speak up." Dkt. No. 1-1 at 6. After Plaintiff confronted both Ms. Mishalanie and Ms. Mendia with concerns about "not giving [her] an equal opportunity[,]" Defendant created another senior position and promoted Plaintiff. *Id*.

In five years of employment, Plaintiff applied for over twenty-seven positions without

3

receiving a promotion.  *See* Dkt. No. 1-1 at 7.  Plaintiff was told she could not switch job titles or

departments until she had worked for Defendant for a year.  *See id.* at 8.  However, other

employees were given promotions within two-to-three months of working.  *See id.*

      In March 2019, Ms. Mishalanie denied Plaintiff's request to work from home, even though

other employees were allowed the opportunity.  *See id.* at 8, 10.  Plaintiff had requested to work

from home to "get away from [her] boss's actions."  *Id.* at 8.  However, in response, Ms.

Mishalanie accused Plaintiff of "attempting to babysit [her] kids," and told Plaintiff "[y]ou cannot

work from home to babysit your kids."  *Id.* at 10.  Ms. Mishalanie "used [Plaintiff's] kids for her

reasons for not giving [Plaintiff] the approval to work from home[.]"  *Id.* at 8.  Ms. Mishalanie

then offered "everyone in the department to work 2 days from home, so it would look like

everyone was given equal rights."[2]  *Id.*

      In March 2020, Plaintiff reached out to Linda Madore ("Ms. Madore") from Defendant's

Human Resources department to discuss her 2019 performance.  *See id.* at 6, 10.  Plaintiff was

told that her pay was based on performance.  *See id.* at 9.  Plaintiff advised Ms. Madore about her

situation with Ms. Mishalanie and that she had mistreated her and misrepresented Plaintiff's actual

performance.  *Id.* at 6.  Plaintiff showed Ms. Madore examples of Plaintiff's 2019 performance

reviews and how Ms. Mishalanie "sabotaged" them.  *Id.*  In response, Ms. Madore told Plaintiff

that the reviews were "ok," and that Plaintiff needed "[t]o work it out with [her] boss."  *Id.*

      Around September or October 2020, Ms. Mishalanie promoted another younger "Irish"

male to a "Mail Audit position"—a position more senior than Plaintiff's at the time.  *See id.* at 6.

Ms. Mishalanie communicated to Plaintiff that she was not qualified for the position.  *See id.*

---

[2] "This was before Covid-19.  After Covid-19 [employees] were sent home to work remotely
every day."  Dkt. No. 1-1 at 8.

Instead of providing Plaintiff with a written denial letter, Ms. Mishalanie spoke to Plaintiff by phone and beyond normal working hours.  *See id.*  Plaintiff alleges that during the call Ms. Mishalanie "abuse[d]" her and made her feel "worthless."  *Id.*  Despite denying Plaintiff the promotion, Ms. Mishalanie proceeded to have Plaintiff perform that position's duties, and even requested that Plaintiff help train the employee.  *See id.*

On October 21, 2020, Ms. Mishalanie communicated with Plaintiff via Skype messaging application.  *See* Dkt. No. 1-1 at 1.  Through the conversation, Ms. Mishalanie increased Plaintiff's workload and insisted that Plaintiff "accomplish all of the additional assigned duties to the neglect of [her] original duties."  *Id.*  Ms. Mishalanie insisted that Plaintiff complete twenty-five mail audits in a day, which was "impossible" to perform, "even by the actual auditors."  *Id.* at 1-2.  Ms. Mishalanie also accused Plaintiff of not doing her job.  *See id.* at 2.  For instance, Ms. Mishalanie told Plaintiff to review her job description and Defendant's "Committed to Delivering Despite All Obstacles" policy.  *See id.*  Plaintiff contends that Ms. Mishalanie gave her "more work than any other employee" and "constantly accused [Plaintiff] of not doing enough."  *Id.* at 9.

After exchanging messages over the course of almost three hours, Plaintiff communicated that she had to leave work and seek medical attention.  *See id.* at 2.  Plaintiff also advised Defendant's Department Director Daniel Trociuk ("Mr. Trociuk") about her situation.  *See id.*  Plaintiff left work and went to an urgent care center.  *See id.*  After seeking help at an urgent care center, Plaintiff was told that her "blood pressure was 197/116" and that her condition was "potentially life-threatening."  *Id.*  Plaintiff was transferred by ambulance to a hospital where she was admitted "to the ICU unit for further evaluation and treatments."  *Id.*  Plaintiff obtained a doctor's note directing her not to work until January 14, 2021, due to "severe headaches, accelerated hypertension, and stress."  *Id.*

About a week later, on October 29, 2020, Plaintiff spoke with Boddie DeRucher ("Mr. DeRucher"), Defendant's "Certified Corporate Wellness Specialist." *See id.* at 2-3. Mr. DeRucher indicated that he would bring the matter to Defendant's human resources department. *See id.* at 3. Thereafter, on November 6, 2020, Mr. DeRucher sent Plaintiff an email indicating that he had spoken with Defendant's human resources department. *See id.* Mr. DeRucher stated that Plaintiff should focus on her health and that when she returned to work he would arrange a meeting between her and management. *See id.*

On January 15, 2021, Plaintiff returned to work following her doctor's approval. *See id.* at 3. Plaintiff had a meeting with Ms. Madore, Mr. Trociuk, and Mr. DeRucher. *See id.* Plaintiff communicated that Ms. Mishalanie's treatment was bad for her health and requested an "easy accommodation" insofar as having Mr. Trociuk serve as her direct supervisor instead of Ms. Mishalanie.[3] *See id.* Defendant refused the accommodation request. *See id.* Defendant "put [her] back to Ms. Mishalanie without any protection." *Id.* According to Plaintiff, Ms. Mishalanie "took advantage" of the situation and required Plaintiff to meet with her three times per week. *Id.*

At the first weekly meeting, Ms. Mishalanie told Plaintiff "I just want to let you know I'm not mad at you." *Id.* That same day, Plaintiff requested a Workers' Compensation form to report the October 21, 2020, incident. *See id.* at 10. However, Ms. Madore refused to provide the form. *See id.* Rather, Ms. Madore told Plaintiff to send "a written report" to her and Mr. Trociuk. *Id.* Plaintiff sent Ms. Madore an email regarding the October 21 incident. *See id.*

On January 19, 2021, Plaintiff's doctor instructed her to take an indefinite leave from work and referred her to a psychiatrist. *See id.* at 3. At this point, Plaintiff's health "was in critical

---

[3] According to Plaintiff, Mr. Torciuk supervised another Bosnian employee, and that Ms. Mishalanie also gave this employee a "hard time," but because she worked under Mr. Torciuk, the employee did not experience the same level of harassment. *See* Dkt. No. 1-1 at 7.

condition." *Id.*  At some point in January or February 2021, while still out on leave, Plaintiff

learned that Ms. Mishalanie hired a new employee for an open Mail Audit position.  *See id.* at 8.

Ms. Mishalanie had described the new hire as "28, from Rome, [New York,] has no kids and has a

dog." *Id.*  According to Plaintiff, most of Defendant's employees are younger than Plaintiff, with

a maximum of two children, born in the United States, and have similar backgrounds to Ms.

Mishalanie.  *See id.*

Plaintiff remained on leave for several months until her termination on May 2, 2021.  *See*

Dkt. No. 1-1 at 3.  Plaintiff emailed an additional "report" to Ms. Madore on February 1, 2021,

and another at some point before February 8, 2021.  *See id.* at 10.  Ms. Madore responded that

"her investigation did not confirm that any of [Plaintiff's] complaints had merit." *Id.*  Regarding

the termination, Defendant indicated that Plaintiff had exhausted her short-term disability and

FMLA leave.  *See id.* at 3-4.  Plaintiff applied for but was denied long-term disability benefits

because she did not meet the definition of "disability" under Defendant's insurance policy.  *See id.*

Defendant deemed Plaintiff to have "abandoned" her job per Defendant's policy.  *Id.* at 4.

On September 13, 2021, Plaintiff filed a complaint with the New York State Division of

Human Rights ("NYSDHR").  *See* Dkt. No. 1-2 at 90.  Ultimately, the NYSDHR dismissed

Plaintiff's complaint based on a finding of no probable cause.  *See* Dkt. No. 1-1 at 4-5.  Plaintiff

received a Right-to-Sue letter from the EEOC on March 9, 2022.  *See* Dkt. No. 1 at 4, 7.

Plaintiff claims that stress caused by Ms. Mishalanie "led to heightened anxiety, inability

to concentrate at [her] workplace, life-threatening high blood pressure, complex headaches, and a

significant risk of stroke." Dkt. No. 1-1 at 1.  Plaintiff continues to experience hypertensive

emergencies, elevated stress levels, and headaches.  *See id.* at 4.  Additionally, Plaintiff has been

diagnosed with post-traumatic stress disorder ("PTSD") from her experience with Defendant.  *See*

*id.*

Defendant argues (1) that most of Plaintiff's claims are time-barred, and (2) that Plaintiff failed to state claims. *See* Dkt. No. 27-1. Specifically, Defendant argues that "claims based on a failure to promote, assignment of unequal job duties, unreasonable increases in pay, and denial of training are based on conduct that occurred before November 17, 2020. As such, those claims are time barred and must be dismissed." Dkt. No. 27-1 at 13. Defendant further argues that Plaintiff fails to allege that any acts of discrimination occurred during the relevant period. *See id.* at 14. Plaintiff has opposed Defendant's motion. *See* Dkt. No. 30.

## III. DISCUSSION

### A.    Legal Standard

Rule 12(c) of the Federal Rules of Civil Procedure provides that "after the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Judgment on the pleadings is appropriate where material facts are undisputed and a judgment on the merits is possible merely by considering the contents of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988); *Allstate Ins. Co. v. Vitality Physicians Grp. Prac. P.C.*, 537 F. Supp. 3d 533, 545 (S.D.N.Y. 2021).

In deciding a Rule 12(c) motion, the court "'employ[s] the same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6).'" *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009)). A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns,*

*Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).  This presumption of truth, however, does not extend to legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face."  *Id.* at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," Twombly, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed."  *Id.* at 570.

"On a 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'"  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)).  The Court may also review any document incorporated by reference in one of the pleadings.  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004), *distinguished on other grounds by Ayers v. Selsky*, 467 Fed. Appx. 45 (2d Cir.

2012).  Finally, the Court may consider a document not specifically incorporated by reference but on which the complaint relies, and which is integral to it.  *See Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021).  Additionally, where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude.  *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006).

## B.  Statute of Limitations

Before filing a suit in federal court under Title VII, the ADA, and the ADEA, "the claimant must make the EEOC filing within 300 days of the alleged discriminatory conduct and, before bringing suit, must receive a 'Notice of Right to Sue' letter from the EEOC." *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (citing *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001)) (other citation omitted); *see also Spurlock v. NYNEX*, 949 F. Supp. 1022, 1026-27 (W.D.N.Y. 1996) (holding that EEOC exhaustion is required in ADA claims); *Holowecki v. Fed. Exp. Corp.*, 440 F.3d 558, 566 (2d Cir. 2006) (ADEA).  "Although the exhaustion of administrative remedies through filing with the EEOC is not a jurisdictional requirement, 'it remains … an essential element of Title VII's statutory scheme, … and one with which defendants are entitled to insist that plaintiffs comply.'" *Muhammad v. N.Y.C. Transit Auth.*, 450 F. Supp. 2d 198, 205 (E.D.N.Y. 2006) (quoting *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000)).  Importantly, courts have noted that, "[t]he 300-day limitations period is not a jurisdictional prerequisite to suit in federal court; it is 'a requirement that, like a statute of limitations, is subject to waiver, estoppel and equitable tolling,'" *Mauro v. Bd. Of Higher Educ.*, 658 F. Supp. 322, 324 (S.D.N.Y. 1986) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (internal quotations omitted)), as well as the

continuing violation doctrine. *See Cruz v. City of New York*, No. 21-CV-1999, 2021 WL
5605139, \*4 (S.D.N.Y. Nov. 30, 2021).

Here, Plaintiff filed a charge of discrimination with the NYSDHR on September 13, 2021.
*See* Dkt. No. 1 at 7.  As such, Plaintiff's claims must arise from events that occurred between
November 17, 2020, 300-days prior to her filing, and May 2, 2021, when she was terminated.  *See*
Dkt. No. 1-1 at 3.[4]  Barring an exception, any claims that accrued prior to November 17, 2020, are
time barred.

Courts in the Second Circuit generally disfavor the continuing violation doctrine and have
declined to extend its applicability absent compelling circumstances.  *See Cotz v. Matroeni*, 476
F. Supp. 2d 332, 356 (S.D.N.Y. 2007) ("Courts in the Second Circuit view continuing violation
arguments with disfavor, and the doctrine's applicability outside of the Title VII or discrimination
context is uncertain"); *Trinidad v. New York City Dep't of Corr.*, 423 F. Supp. 2d 151, 165 n.11
(S.D.N.Y. 2006) ("As a general matter, the continuing violation doctrine is heavily disfavored in
the Second Circuit and courts have been loath to apply it absent a showing of compelling
circumstances").  "Such compelling circumstances include 'unlawful conduct tak[ing] place over a
period of time, making it difficult to pinpoint the exact day the violation occurred; where there is
an express, openly espoused policy that is alleged to be discriminatory; or where there is a pattern
of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness.'" *Clemmons
v. Holder*, No. 13-CV-7229, 2015 WL 4894184, \*5 (E.D.N.Y. Aug. 17, 2015) (quoting *Koehl v.
Greene*, No. 06-CV-0478, 2007 WL 2846905, \*7-9 (N.D.N.Y. Sept. 26, 2007)) (other citation

---

[4] During this period, Plaintiff worked for a total of three days between January 15, 2021, and
January 19, 2021, at which point she left work indefinitely.  *See* Dkt. No. 1-1 at 3; Dkt. No. 1-2 at
72.

Case 6:22-cv-00359-MAD-ATB   Document 40   Filed 09/19/23   Page 12 of 24


omitted); *see also Yip v. Bd. Of Tr. of SUNY*, No. 03-CV-0959, 2004 WL 2202594, *4 (W.D.N.Y. Sept. 29, 2004).

Under the continuing violation doctrine, if a plaintiff has experienced a "continuous practice and policy of discrimination, … the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (internal quotations and citations omitted).  "If a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996).  "[A] continuing violation may be found 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" *Fitzgerald*, 251 F.3d at 359 (citations omitted).  However, "discrete acts," are not subject to the continuing violations doctrine, but may be used as "'background evidence in support of a timely claim.'" *Zoulas v. New York City Dep't of Educ.*, 400 F. Supp. 3d 25, 50 (S.D.N.Y. 2019) (quoting *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019)) (other quotation omitted).[5]

As set forth above, nearly all of Plaintiff's allegations relate to conduct that occurred before November 17, 2020.  These claims include Defendant's failure to promote, assignment of unequal job duties, denial of pay increases, denial of training, and refusal to permit Plaintiff to work more frequently from home.  Each of these allegations represent discrete acts that are all outside the statute of limitations and not subject to the continuing violation doctrine.  *See Zoulas*,

---

[5] Although Plaintiff does not argue that the continuing violation doctrine should apply to her claim, the Court will *sua sponte* consider its application in light of her *pro se* status.

400 F. Supp. 3d at 50 ("Examples of discrete acts, for the purposes of the continuing violation doctrine, include disparate disciplining, negative performance reviews, termination, failure to promote, and denial of a preferred job position"); *Collins v. City of New York*, 156 F. Supp. 3d 448, 458 (S.D.N.Y. 2016) (concluding that the plaintiff's claims that "she was constructively discharged and threatened with negative employment evaluations prior to [the limitations period] are discrete actions and are barred by the statute of limitations"); *Everett*, 2022 WL 2342693, at *5 (holding that "[t]he negative performance reviews, transfer of schools, and social slights were discrete acts" not subject to the continuing violation doctrine).  As such, the Court will not consider these allegations in assessing Plaintiff's claim, except as relevant background evidence. *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) ("[E]xpiration of the limitations period does not bar 'an employee from using the prior acts as background evidence in support of a timely claim'") (quotations omitted).

Plaintiff argues that based on a state executive order, the statute of limitations was tolled, thereby making allegations dating back to January 28, 2020 timely.  *See* Dkt. No. 30 at 19; Dkt. No. 30-1 at 38.  The Court disagrees.  The district courts in the Second Circuit have consistently found that the executive orders at issue only toll claims based on state law and federal-law claims brought under statutes that borrow New York's statute of limitations (*i.e.*, Section 1983).  *See Verne v. New York City Dep't of Educ.*, No. 21-cv-5427, 2022 WL 4626533, *6-7 (S.D.N.Y. Sept. 30, 2022) (holding that the executive orders at issue did not toll the federal statute of limitations for the plaintiff's claims under Title VII, the ADA or the ADEA because those claims are governed by a federal statute of limitations and federal tolling rules) (citing cases); *see also Bonilla v. City of New York*, No. 20-cv-1704, 2020 WL 6686531, *1-2 (E.D.N.Y. Oct. 3, 2020) (holding that the executive order tolled the plaintiff's claims under Section 1983 because in these

cases the court is required to apply the New York statute of limitations and state tolling rules); *Everett v. New York City Dep't of Educ.*, No. 21 Civ. 7043, 2022 WL 2342693, *5 (S.D.N.Y. June 29, 2022) ("'[V]arious executive orders issued throughout the COVID-19 pandemic did not purport to toll time periods prescribed by federal law and they were not justified by any limitation of access to the federal courts'") (quoting *Romero v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 21-CV-4951, 2022 WL 624451, *5 (S.D.N.Y. Mar. 2, 2022)).  As Plaintiff did not raise any state law claims or claims under federal law which "borrow" state statutes of limitations, these executive orders do not toll the limitations period for the claims in this case.[6]

### C.    Failure to State a Claim

#### *1. Discrimination*

Discrimination claims under Title VII and the ADEA are analyzed according to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, a plaintiff must first make a *prima facie* case of discrimination by showing that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802); *see also Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) ("A *prima facie* case of age discrimination requires that plaintiffs demonstrate membership in a protected class, qualification for their position, an adverse employment action, and circumstances that support an inference of age discrimination").

---

[6] Plaintiff does not allege that the doctrine of equitable tolling applies.  Regardless, the Court finds it inapplicable to this case, as Plaintiff has not alleged "extraordinary circumstances" that prevented her from filing sooner.  *See Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (quotation omitted).

A *prima facie* case of discrimination under the ADA requires that the plaintiff demonstrate that "(1) her employer is subject to the ADA; (2) she is disabled within the meaning of the ADA; (3) she is otherwise qualified to perform the essential functions of her job with or without accommodation; and (4) she suffered an adverse employment action because of her disability." *Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, 767 Fed. Appx. 123, 127 (2d Cir. 2019) (citing *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004)).

"[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

An employee sustains an "adverse employment action" if he "endures a materially adverse change in the terms and conditions of employment …. An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (citation and quotation marks omitted).  Examples that may constitute adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (quotation omitted).  Additionally, a plaintiff may establish actionable harassment by "demonstrat[ing] either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of

[his] working environment." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (citation and quotation marks omitted).

"Unprofessional and boorish" treatment does not amount to an adverse employment action. *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008). "Such treatment may include intimidating behaviors, and a refusal to allow an employee to do desired duties, so long there as there is no '"materially adverse change in the terms and conditions of employment.'" *Mills v. S. Connecticut State Univ.*, 519 Fed. Appx. 73, 75 (2d Cir. 2013) (quoting *Mathirampuzha*, 548 F.3d at 78).

In the present matter, Plaintiff alleges the following are adverse employment actions: failure to promote in comparison to males and those of other national origins or religions, excess work in comparison to all other employees supervised by Ms. Mishalanie, and excess meetings. As noted above, however, Plaintiff's claims based on conduct occurring prior to November 17, 2020, are time barred.  Plaintiff does not dispute that she was continuously out of work from October 21, 2020 through January 14, 2021, and then again from January 19, 2021 through her separation on May 2, 2021.  As such, Plaintiff only worked for three days during the relevant time period.

In her response, Plaintiff claims that she was discriminated against during this time period in the following ways: (1) Plaintiff had a meeting with her supervisor, Ms. Mishalanie, and that during (or after) this meeting, Ms. Mishalanie said to Plaintiff, "I am not mad at you;" (2) Defendant denied Plaintiff's request to be transferred to a different supervisor; and (3) Plaintiff was terminated.  *See* Dkt. No. 30.

First, Ms. Mishalanie's alleged statement about not being "mad," even if made, cannot form the basis for a discrimination claim because the statement does not constitute an adverse

employment action.  Plaintiff's subjective belief that this comment amounted to an adverse

employment action is insufficient.  Rather, Plaintiff must allege that the action somehow

objectively materially changed the terms and conditions of her employment.  *See Kirkland-*

*Hudson v. Mount Vernon City Sch. Dist.*, ___ F. Supp. 3d ___, 2023 WL 2691622, *16 (S.D.N.Y.

2023) ("'[A]dverse employment actions … must be more than trivial, insubstantial, or petty'")

(quotation and other citations omitted); *Abalola v. St. Luke's-Roosevelt Hosp. Ctr.*, No. 20-CV-

6199, 2022 WL 973861, *7 (S.D.N.Y. Mar. 30, 2022) ("[The plaintiff's] claims that [two

individuals] harassed and demeaned her do not constitute adverse employment actions"); *LeeHim*

*v. N.Y.C. Dep't of Educ.*, No. 17-CV-3838, 2017 WL 5634128, *4 (S.D.N.Y. Nov. 21, 2017)

(explaining that "'petty slights,' such as shushing" and "rude and intemperate conduct" do not

amount to adverse employment actions); *Jaeger v. North Babylon Union Free Sch. Dist.*, 191 F.

Supp. 3d 215, 227 (E.D.N.Y. 2016) (holding that that the alleged adverse employment action

"must objectively alter for the worse the terms and conditions of a plaintiff's employment")

(citation omitted).  Indeed, "courts in this circuit have universally rejected attempts by plaintiffs to

show an adverse employment action based simply on the plaintiff's personal feelings about the

employer's actions."  *Islamic Society of Fire Dep't Personnel v. City of New York*, 205 F. Supp. 2d

75, 85 (E.D.N.Y. 2002) (citations omitted).  The reason for this rule is clear: "if a plaintiff's

subjective feelings regarding his employer's actions controlled, 'every trivial personnel action that

an irritable, chip-on-the-shoulder employee did not like would form the basis for a discrimination

suit.'" *Id.* at 84 (quotation omitted).  Moreover, even if Ms. Mishalanie's alleged statement

somehow constituted an adverse employment action, Plaintiff has failed to allege facts plausibly

suggesting that it was related to any of Plaintiff's protected characteristics.

17

Second, Defendant's decision not to transfer Plaintiff to a different supervisor did not constitute an adverse employment action.  *See Gutierrez v. City of New York*, 756 F. Supp. 2d 491, 508 (S.D.N.Y. 2010) (holding that the plaintiffs failed to establish that they suffered an adverse employment action based on the defendant's alleged refusal to act on transfer requests, where the complaint did not allege that the plaintiffs sought transfer to a different type of position, or that the transfer would alter the terms and conditions of their employment); *Hawana v. City of New York*, 230 F. Supp. 2d 518, 528 (S.D.N.Y. 2002) (holding that the defendant's refusal to transfer the plaintiff was not an adverse employment action where "the transfer was sought simply to get away from his supervisor and involved no change in pay or title") (citations omitted); *Beyer v. County of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008) ("A denial of a transfer may ... constitute an adverse employment action, but we require a plaintiff to proffer objective indicia of material disadvantage; 'subjective, personal disappointment[ ]' is not enough") (quotation omitted); *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (concluding that the denial of an employee's request for transfer is not an adverse employment action unless the denial "created a materially significant disadvantage in her working conditions").  Moreover, Plaintiff failed to allege any facts suggesting that the decision to deny her transfer request was based upon any of Plaintiff's protected characteristics.  Plaintiff's subjective belief is insufficient to give rise to an inference of discrimination.  *See Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-cv-3625, 2013 WL 3968748, *6 (E.D.N.Y. July 30, 2013).

Finally, Plaintiff has failed to plausibly allege that Defendant's decision to terminate her employment was motivated by discriminatory animus.  Rather, the complaint and Plaintiff's response make clear that, after exhausting all available leave, including paid time off, short term disability leave, and FMLA leave, Plaintiff was separated from employment because she failed to

return to work without a timeline for her return in sight.  Plaintiff fails to allege that she was treated differently from other similarly situated individuals or that the decision to terminate her employment was based on impermissible considerations.  "The case law on disability discrimination claims is clear that a plaintiff's unavailability to return to work after a period of leave, including unavailability because of a disabling injury or medical condition, is a legitimate, non-discriminatory reason for termination."[7] *Pardo v. Nielsen*, No. 19-cv-616, 2021 WL 1143897, *6 (S.D.N.Y. Mar. 23, 2021) (citations omitted); *see also Scott v. Mem'l Sloan-Kettering Cancer Ctr.*, 190 F. Supp. 2d 590, 597 (S.D.N.Y. 2002); *Daley v. Cablevision Sys. Corp.*, No. 12-cv-6316, 2016 WL 880203, *6 (S.D.N.Y. Mar. 7, 2016) (holding that the defendant's argument that "indefinite leave would impose an undue hardship on [it]" was a "legitimate, nondiscriminatory" reason for termination), *aff'd*, 675 Fed. Appx. 97 (2d Cir. 2017); *Holowecki v. Fed. Exp. Corp.*, 382 Fed. Appx. 42, 46 (2d Cir. 2010) (affirming summary judgment on age discrimination claims where the plaintiffs were "terminated following medical leaves of absence," explaining that the plaintiffs failed to make a *prima facie* case of discrimination because they failed to show that they were qualified to work in light of evidence that they were "unable to return to work" or failed to report for work).  Moreover, Plaintiff has failed to create an inference of discriminatory intent by, for example, alleging that other, similarly situated individuals on indefinite leave were treated more favorably than here.  *See Knope v. Garland*, No. 20-cv-3274, 2021 WL 5183536, *3 (2d Cir. Nov. 9, 2021) (affirming the dismissal of the plaintiff's discrimination claim where the plaintiff failed to show that her employer treated a similarly situated individual outside of her

---

[7] Plaintiff attached to her complaint a letter from her treating therapist dated February 4, 2022, which states that the therapist has been treating Plaintiff since March 24, 2021, and that, through the date of that letter, Plaintiff's medical conditions "are preventing her from working." Dkt. No. 1-2 at 83.

protected group more favorably and because, alternatively, the defendant articulated a legitimate, non-discriminatory reason for the plaintiff's termination – "that she was medically unable to perform her job at all for an unknown period of time").

Accordingly, the Court finds that Plaintiff has failed to state a claim for discrimination under Title VII, the ADA, or the ADEA and grants this aspect of Defendant's motion to dismiss.

### 2. Failure to Accommodate

"An employer may … [also] violate the ADA by failing to provide a reasonable accommodation" for an employee's disability. *Dominelli v. N. Country Acad.*, No. 1:16-CV-203, 2016 WL 6833992, *2 (N.D.N.Y. Nov. 18, 2016) (quoting *McMillan*, 711 F.3d at 125). To state a claim under the failure to accommodate framework, a plaintiff must allege that "(1) [p]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [his] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Harvin v. Manhattan and Bronx Surface Transit Operating Auth.*, 767 Fed. Appx. 123, 126 (2d Cir. 2019) (quoting *McBride*, 583 F.3d at 96-97).

Defendant only addresses the third prong and fourth prong. However, with regards to the first prong, Plaintiff can allege a disability within the meaning of the ADA sufficient to withstand a motion to dismiss. A "disability" is defined as a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Plaintiff alleged that she experienced "heightened anxiety, inability to concentrate at my workplace, life-threatening high blood pressure, complex headaches, and a significant risk of stroke." Dkt. No. 1-1 at 1. Plaintiff claims she now has PTSD, hypertensive emergencies, and high stress levels. *See id.* at 4. Plaintiff has been diagnosed with depression, anxiety, migraine issues, hypertensive

urgency, and adjustment disorders.  *See* Dkt. No. 1-2 at 42, 79, 83.  Plaintiff argues that she is

"not able to work or function on a daily basis," and has trouble sleeping.  *See* Dkt. No. 1-1 at 11;

Dkt. No. 1-2 at 28.  Based on these facts, the Court finds that Plaintiff has sufficiently pled a

disability within the meaning of the ADA.  As to the second prong, Defendant had knowledge of

the alleged disability based on Plaintiff being out on medical leave and communications with

Defendant's employees.  *See* Dkt. No. 1-1 at 3, 10; Dkt. No. 1-2 at 9-10, 74.

  "Reasonable accommodations may include adjustments to work schedules or other job

restructuring."  *McMillan*, 711 F.3d at 127 (citing 45 C.F.R. § 84.12(b) (2005)).  However, "an

accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that

it will produce."  *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995) (citing

*Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995)).  Furthermore, "[t]he

accommodation must allow the employee to perform the essential functions of [his] job at the

same level as the rest of the workforce."  *Fowler v. Kohl's Dep't Stores, Inc.*, No. 1:07-CV-1197,

2009 WL 2155481, *5 (N.D.N.Y. July 16, 2009) (citing *Borkowski*, 63 F.3d at 138 n.3).

  Defendant argues that Plaintiff failed to exhaust her administrative remedies with regards

to this claim as she did not allege facts or refer to a failure to accommodate in her administrative

complaint.  *See* Dkt. No. 27-1 at 17-18 (citing Dkt. No. 1-2 at 93-105, 129-35).  Plaintiff fails to

directly address to this argument in her response, but reiterates that she was not allowed to report

to a different supervisor "based on [her] protection class."  Dkt. No. 30 at 24.  In her initial

complaint to the NYSDHR, Plaintiff failed to check a box indicating she was complaining of a

failure to accommodate.  *See* Dkt. No. 1-2 at 95.  However, the NYSDHR mentioned possible

reasonable accommodations in its decision.  *See id.* at 91.  Plaintiff in her initial complaint

specified that she could not "be one-on-one with this person," and that after a meeting, HR "put

[Plaintiff] back to report to [Ms. Mishalanie]." *Id.* at 97.  Plaintiff also discussed being terminated

generally, *see id.* at 99, and that before being terminated her doctor "took [her] out of work

again."  As such, the Court will assume for purposes of this decision that Plaintiff exhausted her

failure to accommodate claim before the NYSDHR.

      Nevertheless, the Court finds that the failure to accommodate claim is still subject to

dismissal.  "Courts have consistently ruled that 'an employee cannot be considered otherwise

qualified when she is unable to report to work at the time required, because she is not able to

perform the essential functions of her job.'"  *Lewis v. New York City Police Dep't*, 908 F. Supp. 2d

313, 327 (E.D.N.Y. 2012), *aff'd*, 537 Fed. Appx. 11 (2d Cir. 2013); *see also, e.g.*, *Micari v. Trans

World Airlines, Inc.*, 43 F. Supp. 2d 275, 281 (E.D.N.Y. 1999), *aff'd*, 205 F.3d 1323 (2d Cir.

1999) (collecting cases).  Even when an employee's "persistent absence from work" is a result of a

disability, such "persistent absence from work, alone, precludes him from being considered

qualified under the ADA."  *Pierce v. Highland Falls–Fort Montgomery Central Sch. Dist.*, No.

08-CV-1948, 2011 WL 4526520, *5 (S.D.N.Y. Sept. 28, 2011).

      Here, Plaintiff has failed to allege that she could perform an "essential function" of her

employment, *i.e.*, showing up for work.  *See Rinaldi v. Quality King Dist., Inc.*, 29 F. Supp. 3d

218, 227 (E.D.N.Y. 2014) (citation omitted).  The complaint and attached documents make clear

that as of May 2, 2021, Plaintiff was on an indefinite leave, and that the last medical note supplied

by her medical providers did not have an estimated return date.  *See* Dkt. No. 1-2 at 91.

Moreover, Plaintiff was still unable to work in September 2021, when she filed her administrative

complaint with the NYSDHR.  It is well-established that "[t]he duty to make reasonable

accommodations does not, of course, require an employer to hold an injured employee's position

open indefinitely while the employee attempts to recover[.]" *Parker v. Columbia Pictures Indus.*,

204 F.3d 326, 338 (2d Cir. 2000).  Plaintiff is asking this Court to find that Defendant was obligated under the ADA to keep her position open indefinitely, without any prospect for return. This is not required by the ADA and this aspect of Plaintiff's complaint must be dismissed.  *See Sears-Barnett v. Syracuse Community Health Ctr., Inc.*, 531 F. Supp. 3d 522, 542 (N.D.N.Y. 2021) (dismissing an ADA accommodation claim, holding that "plaintiff ask far too much by suggesting that [her employer] should have held her position open for her without any indication of when or if she would be able to return"); *D'Angelo v. MAXIMUS/NY Medicaid Choice*, No. 19-cv-7957, 2022 WL 3043665, *20 (S.D.N.Y. Aug. 2, 2022) (noting that courts in the Second Circuit have held that "a leave of absence for a finite period may be a reasonable accommodation if an employee shows that leave will enable him to perform the essential functions of his job. … But '[w]hile temporary leave, for a specified period of time, with clear prospects for recovery, could be a reasonable accommodation, an indefinite leave of absence is not'") (quotation omitted).

Similarly, Plaintiff's claim that her request to be transferred to a different supervisor constituted a reasonable accommodation also fails because she has not alleged that she could perform the essential functions of her job, without or without an accommodation.  As noted, Plaintiff was continuously out of work from October 21, 2020 through January 14, 2021, and then again from January 19, 2021 through May 2, 2021, the date of her termination.  Plaintiff's therapist indicated that she has been treating Plaintiff since March 24, 2021, and that, through the date of that letter (February 4, 2022), Plaintiff's medical conditions "are preventing her from working." Dkt. No. 1-2 at 83.  As such, the complaint and attached exhibits make clear that, even with this alleged accommodation, Plaintiff would have been unable to perform the essential functions of her job.  Finally, courts have regularly found that accommodation requests to be transferred to a different supervisor because of the stress caused by working under a particular

supervisor is not reasonable. *See Potter v. Xerox Corp.*, 88 F. Supp. 2d 109, 114 (W.D.N.Y. 2000) (holding that the plaintiff's request to be transferred to a different department under a different supervisor "is not considered to be a 'reasonable' accommodation under the ADA.  A request to change supervisors is presumed to be unreasonable, and the burden of overcoming that presumption lies with the plaintiff") (citing cases); *Woolf v. Strad*a, No. 19-860-CV, 2020 WL 583131, *2 (2d Cir. Feb. 6, 2020) (holding that a request for transfer and a request to work without oversight from current supervisors were not reasonable accommodations where the plaintiff otherwise "'fail[ed] to identify a suitable position' that was open, that he was qualified for, and 'to which [he] could have been transferred'") (quoting *McBride*, 583 F.3d at 96-97).

Accordingly, the Court grants Defendant's motion for judgment on the pleadings as to Plaintiff's failure to accommodate claim under the ADA.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for judgment on the pleadings is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 19, 2023
        Albany, New York

Mae A. D'Agostino
U.S. District Judge